In the

# United States Court of Appeals

### For the Seventh Circuit

No. 14-2968

CHRIS E. CARHART,

*Plaintiff-Appellee,*

*v.*

CARHART-HALASKA INTERNATIONAL, LLC,

*Defendant,*

CHRISTOPHER G. HALASKA and HALASKA INTERNATIONAL, INC.,

*Appellants.*

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 2:14-mc-00023-JPS — **J. P. Stadtmueller**, *Judge.*

ARGUED APRIL 17, 2015 — DECIDED JUNE 8, 2015

Before POSNER and WILLIAMS, *Circuit Judges*, and WOOD, *District Judge*.*

POSNER, *Circuit Judge*. Karl Marx famously remarked that "all great world-historic facts and personages appear … twice …: the first time as tragedy [Napoleon I], the second time as farce [the great Napoleon's nephew, Napoleon III]." William Gaddis reversed the sequence in his satirical law novel *A Frolic of His Own* (1994). At the beginning of the novel the protagonist, while standing in front of his car trying to hot-wire it, accidentally causes the car to start. It lurches forward, injuring him—so he sues himself for having negligently injured himself. The case before us brings us face to face with a form of self-suing that brings in its train a variety of business and legal complexities.

Chris E. Carhart and Christopher G. Halaska, the respective sole owners of Carhart, Inc. and Halaska International, Inc., formed a Wisconsin limited liability company that they named Carhart-Halaska International, LLC (and that the parties call CHI for short, as will we), owned 50-50 by their two corporations. We'll treat Messrs. Carhart and Halaska rather than their corporations as the co-owners of CHI, because both men have litigated the case in their own names as well as in the names of their corporations, with each man and corporation on the same side of the case seeking the same relief, and thus Carhart, Inc. and Carhart constituting one litigating unit and Halaska International, Inc. and Halaska another.

CHI—the new company—supplied construction materials to builders and provided engineering services. We use

---

* Hon. Andrea R. Wood of the Northern District of Illinois, sitting by designation.

the past tense because, as we'll see, the company is defunct. We don't know the current status of the two component corporations.

A Minnesota company called MRO Industrial Sales, LLC, was a sales agent for CHI. In 2012 CHI terminated MRO, which reacted by suing CHI in the federal district court in Minnesota for breach of contract and related wrongs. Jurisdiction was based on diversity of citizenship, for remember that CHI is a citizen of Wisconsin. Within weeks after the suit was filed, Carhart obtained an assignment of MRO's claim, for which he claims to have paid MRO $150,000. By stepping into MRO's shoes he became the plaintiff in a suit against a company of which he was (through his wholly owned corporation) a half owner.

Halaska forthwith sued Carhart—both on Halaska's own behalf and on behalf of CHI—in a Wisconsin state court. The suit charged Carhart with having breached his fiduciary duties to CHI and Halaska by becoming the plaintiff (as a result of MRO's assignment to it) in the Minnesota suit and also by writing checks on CHI bank accounts without Halaska's approval, depositing payments owed CHI into Carhart's own corporate account, entering into a contract on CHI's behalf without letting Halaska know that Carhart had a conflict of interest relating to the transaction, and withholding accounting and other financial information concerning CHI from Halaska. Essentially the claim is that Carhart plundered the company that he and Halaska co-owned, the plundering presumably consisting of his withdrawing his own investment and siphoning off part or maybe all of Halaska's investment—the latter being a plausible though not compulso-

ry inference from the fact that CHI, as we're about to see, is now assetless.

Halaska asked the Wisconsin state court to appoint a receiver to wind up CHI (that is, arrange its affairs and having done so dissolve it) because it was in imminent danger of insolvency as a result of unpaid debts not limited to MRO's claim bought by Carhart, and of Carhart's other acts of betrayal of CHI. The receiver was appointed but shortly afterward informed the district court in Minnesota that CHI was insolvent and had no liquid assets out of which to pay a lawyer to defend against the suit by Carhart (in succession to MRO) in Minnesota. The receiver therefore consented to the entry of a default judgment for $242,000 against CHI (the amount sought by Carhart in that suit). The judgment yielded Carhart a potential profit of $92,000 ($242,000 – $150,000) on his purchase of MRO's claim. (We say "potential profit" because its realization depended on CHI's possessing at least $242,000 worth of assets, which, as we'll see, it did not.) Presumably the difference between the two figures represented potential (but again, not actual) compensation to Carhart for having assumed the risk, originally borne by MRO, of losing the suit against CHI that he had bought from MRO.

Which brings us at last to the present suit: a suit in federal district court in Wisconsin brought by Carhart against CHI under Fed. R. Civ. P. 69(a)(1) to execute the $242,000 default judgment that he had obtained as a result of the receiver's inability to defend CHI against the Minnesota suit. CHI was left with its suit (jointly with Halaska) against Carhart in the Wisconsin state court, where that suit was, and as we'll see still is, pending. That suit was the company's only remaining asset, and Carhart filed the present case (the Wis-

consin federal court suit to enforce its $242,000 judgment against CHI) in order to obtain it. The district court executed the judgment, ordering the seizure and sale of CHI's lawsuit in order to satisfy Carhart's judgment (in part), the lawsuit being as we said CHI's only remaining asset. The lawsuit was sold at public auction; Carhart, the only bidder, bought it for $10,000. By doing so he extinguished all possibility that CHI could obtain relief against him for his alleged plundering of the company. At a total cost of $150,000 (for Carhart got his $10,000 payment right back after the sale, since it was the proceeds of the sale of the asset that Carhart executed his judgement upon), he had insulated himself against potential liability to CHI for allegedly plundering the company.

But this assumes that Wisconsin law allows a lawsuit to be the kind of property that can be seized to pay a judgment. Fed. R. Civ. P. 69(a)(1) authorizes a federal district court to enforce a money judgment by writ of execution but (with immaterial exceptions) only pursuant to the procedure authorized by the state in which the federal court is located, and, as discussed below, it is unclear whether Wisconsin considers a lawsuit to be property that can be seized to pay a judgment. See Wis. Stat., ch. 815.

Carhart was ingenious! The question is whether his scheming was legal. An anterior question is whether we have jurisdiction to answer that question. The appellants are Halaska and his wholly owned corporation (but which we can, as we said earlier, ignore). But Halaska was not named as a defendant in Carhart's suit to execute the $242,000 Minnesota judgment; only CHI was—and CHI is not appealing. Halaska has a substantial financial stake in the proceeding, given his half ownership (maybe whole ownership, given

Carhart's defection), and complete control, of CHI. With CHI crumbling in the face of Carhart's defection and his litigation against CHI—and in fact in receivership—Halaska, as sole remaining owner, is the company's alter ego, trying to pick up the pieces from the disaster that began with MRO's suit and what he contends is the plundering of his company by his business partner. He belongs in this suit. And while he was not a named party and did not move to intervene in the district court until after he had filed a notice of appeal (which the district court held was too late), he participated fully in the proceeding, just as if he had intervened and become a party. The judge treated him as a party. He was thus a de facto party.

But is there such a thing in federal law? A judge can say to a person who has a substantial interest in a case but is not a party "you belong in this case, so I want you to move to intervene and I'll grant your motion." This may not be an enforceable order, but it's likely to be obeyed. That's in effect what happened in this case, minus the dialogue and the formal motion. With CHI abandoned by Carhart and in receivership, yet the receiver apparently helpless for lack of financing (though he had filed an objection in the district court, he did not file an appeal from the district court's decision), Halaska was Carhart's only opponent. Halaska had a legitimate interest in the case as the half and maybe sole owner of CHI, and so the judge deemed him a party without insisting on the formality of a motion to intervene.

We conclude that Halaska was and remains a party. Cf. *SEC v. Enterprise Trust Co.*, 559 F.3d 649, 651–52 (7th Cir. 2009). "Appeals by those who participated as if parties are frequently entertained despite a failure to achieve formal

status as a party. Most of these appeals involve persons who participate in trial court proceedings as if they had intervened, and who seem to have been treated on all sides as de facto parties." 15A Charles Alan Wright et al., *Federal Practice and Procedure* § 3902.1 (2d ed., updated Apr. 2015). That's this case.

So we have jurisdiction, and come at last to the merits, where the principal issue is the propriety of the judge's having ordered the auctioning off of CHI's lawsuit (CHI's only remaining asset) in order to provide partial satisfaction of Carhart's judgment. This is a separate question from whether Wisconsin law allows a lawsuit to be property that can be seized to pay a judgment. That question would become moot if, whether or not the lawsuit is seizable property, the district judge erred in thinking seizure the appropriate remedy in this case. The alternative would have been to allow the lawsuit against Carhart to proceed to judgment. CHI (which is to say Halaska) might have been able to prove that Carhart's initial decision to buy MRO's claim against CHI had initiated a train of events likely to culminate, and in fact culminating, in the company's destruction. For all we know, a judge or jury might have found merit in the suit and ordered Carhart to pay damages to CHI greater than the $242,000 that CHI owed him. In that event the company would have come out of the protracted litigation ahead of the game, rather than getting nothing from its legal struggle with Carhart except the $10,000 that he paid for the lawsuit at the public auction—which CHI can't keep, because it's to be used to satisfy a portion of the Minnesota judgment that Carhart obtained. It's as if Carhart had pulled a $10,000 wad of bills out of his left pants pocket and stuffed it into his right pants pocket.

It might be thought that if CHI's lawsuit had had a positive net expected value, someone at the auction would have bid more than $10,000 for it. No one did, and this might suggest that the lawsuit had only negligible value. But maybe not. Suits are difficult to value; that is doubtless why MRO sold its claim against CHI to Carhart for what may have been much less than it was worth ($150,000 versus $242,000, though we don't know on what the latter figure was based). And Carhart as claimant had the best sense of the value of CHI's claim against him because he knew what *he* had done that might make him liable for damages; what sense of that would a bidder at a public auction have? If someone were to place an undisclosed sum of money in an envelope and challenge you to bid against them for it, you'd be a fool to accept the challenge; for if you underbid you would get nothing and if your bid happened to be the winning bid you would certainly have overpaid, because your opponent would know the true amount in the envelope. And so it would be in this case. Better to let CHI litigate its claim and let the state court decide what it was worth—which may have been a lot more than Carhart's successful $10,000 bid.

But this raises the question whether the district judge can be faulted for having adopted an approach to valuation—the public auction—that, as should have been foreseen, proved to be enormously disadvantageous to CHI. When viewed as a form of property (the property of CHI), a lawsuit is what is called a "chose in action," namely a form of intangible property as contrasted with a chunk of real estate, the classic example of tangible property. Long ago the Supreme Court of Wisconsin suggested that a chose in action, including therefore a legal claim, while it can be garnished cannot be sold to satisfy a debt. *Storm v. Cotzhausen*, 38 Wis. 139, 143–44 (1875).

But those were the days when the sale of a lawsuit was forbidden by the common law doctrines of champerty and maintenance, doctrines that have been abrogated or diluted in many states, including Wisconsin. Wis. Stat. § 895.375 states that "no action, special proceeding, cross complaint or counterclaim in any court shall be dismissed on the ground that a party to the action is a party to a contract savoring of champerty or maintenance unless the contract is the basis of the claim pleaded." Today "trolldom"—the seeking of financial advantage by buying or otherwise obtaining a legal claim (as distinct from filing a legal claim in order to seek redress for injury)—thrives. The commonest example of a law troll is the patent troll, who acquires by purchase or application to the Patent and Trademark Office a patent that he uses not to protect an invention but to obtain a license fee from, or legal judgment against, an alleged infringer. Carhart was a troll of sorts in buying MRO's legal claim in order to extinguish CHI's lawsuit against him. But the immediate issue is his being allowed to bid on CHI's suit against him (and thus buy a second lawsuit). Even if (a question we needn't try to answer) a lawsuit is property that Wisconsin law allows to be be seized to pay a debt, Carhart should not have been allowed to buy CHI's lawsuit to satisfy (in part) his judgment against CHI. For as we said, CHI's suit was enveloped in too much uncertainty for potential bidders to be able to value and thus bid intelligently on it (see Kristopher Wood, Comment: "Short Circuiting the Justice System: How Defendants Are Misusing Writs of Execution," 39 *Pepperdine Law Review* 747, 787–88 (2012)), especially because Carhart was as a practical matter on both sides of the transaction. If there was a "smoking gun" piece of evidence proving Carhart's misdeeds that would come out in discovery,

Carhart would already know of its existence, but what would an outsider know about CHI and its financial difficulties, or about Carhart and his (or his corporation's) contractual or statutory duties to CHI? Nor could an outsider (a potential bidder at the auction of CHI's lawsuit) use discovery to try to find out.

Neither do we know the exact value of the lawsuit. But we know the floor. Carhart says he paid MRO more than $150,000 for its claim (it seems that he paid for MRO's attorneys' fees as well, but no amount is stated). He must have thought CHI's only asset—its lawsuit against him—worth more than that. Yet Carhart paid only $10,000 for CHI's assets at the auction, and that almost certainly was too low. Wisconsin allows an execution sale to be set aside when "the price bid is so low as to shock the conscience of the court." *Wilson v. Craite*, 210 N.W.2d 700, 702 (Wis. 1973), citing *Anthony Grignano Co. v. Gooch*, 47 N.W.2d 895, 897 (Wis. 1951), and *Collins v. Smith*, 44 N.W. 510, 512 (Wis. 1890). In both cited cases the Supreme Court of Wisconsin stated that the bid prices would be so low as to shock the conscience if they were proved as alleged to be 45 percent and 24 percent of the value of the properties. In the present case (in which the property was a lawsuit) the bid price may have been less than 7 percent of a minimum reasonable estimate of the property's value, if that minimum reasonable estimate would have been $150,000.

So the district judge should have allowed CHI's Wisconsin state court's lawsuit to proceed—and for the further reason that by auctioning off the lawsuit the judge placed ahead of CHI's other creditors the creditor—Carhart—who had allegedly destroyed the LLC for his own financial gain. That

made his claim vulnerable to equitable subordination, which allows a claim's priority to be reduced if "the claimant is guilty of misconduct that injures other creditors or confers an unfair advantage on the claimant." *In re Kreisler*, 546 F.3d 863, 866 (7th Cir. 2008); see also *In re Mader's Store for Men, Inc.*, 254 N.W.2d 171, 184 (Wis. 1977) ("there may be claims which are genuine, in the sense that they are neither sham nor unlawful or otherwise subject to complete disallowance, but which arise under circumstances such that it would be inequitable to permit them to participate in distribution of the estate on an equal basis with other general claims"). Reducing a claim's priority may be appropriate when the claim holder, a member of an LLC (such as Carhart, whose corporation, the formal member, was his puppet) commits "a willful failure to deal fairly with the limited liability company or its members in connection with a matter in which the member or manager has a material conflict of interest." Wis. Stat. § 183.0402. It will be for the Wisconsin state court to decide whether Carhart's claim should be equitably subordinated.

Although the sale of CHI's lawsuit to Carhart has taken place, Carhart was not a purchaser in good faith, and so the sale did not moot CHI's challenge to the sale. As no valid interest would be impaired by rescinding the sale, we order the district court to rescind it, thus enabling CHI to prosecute its suit against Carhart in the Wisconsin state court, where the suit will again be pending once the sale of the suit to Carhart is rescinded. The judgment of the district court is therefore reversed and the case remanded with instructions.